**J. C. BOOTH, Appellant,**

v.

**PEAVEY COMPANY COMMODITY SERVICES, Appellee.**

**No. 19915.**

United States Court of Appeals, Eighth Circuit.

Aug. 27, 1970.

---

Leonard Rose, Kansas City, Mo., for appellant, and filed brief and reply brief.

Glenn E. McCann, of Knipmeyer, McCann & Millett, Kansas City, Mo., for appellee, Lebert D. Shultz, Kansas City, Mo., on the brief.

Before MATTHES, Chief Judge, and LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The trial court granted the defendant's motion for a directed verdict at the close of the plaintiff's case. The plaintiff appeals contending that he presented evidence from which the jury could have found that the defendant had "churned" plaintiff's commodity account for its benefit rather than that of the plaintiff. We affirm.

While the point was not argued by the parties, we feel it necessary to consider first whether an investor has a right to institute an action against a dealer for churning a commodity account. Such an action is not specifically provided for by the Commodity Exchange Act, 7 U.S.C. §§ 1–17. We believe, however, that a private remedy for churning a commodity account is permitted by either § 6(d) of the Commodity Exchange Act, Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967), or the applicable portions of the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq., and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq., Maheu v. Reynolds & Co., 282 F.Supp. 423, 429, n. 2 (S.D.N.Y.1968); W. J. Abbott & Co. v. S.E.C., 276 F.Supp. 502 (W.D.Pa.1967). See also, Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn.1968); Berman v. Orimex Trading, Inc., 291 F.Supp. 701 (S.D.N.Y.1968).

We now turn to the merits. To establish churning, it is necessary to prove that the dealer has control of the account and that there has been excessive trading in it. See, e. g., Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D. Cal.1968); Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). Here, the trial court found that the plaintiff's evidence failed to produce any facts from which the jury could find either element.

We have carefully reviewed the entire record in light of the familiar rule that "* * * a directed verdict at the close of the plaintiff's evidence should be sparingly used and that on * * * appeal the plaintiff is entitled to the

benefit of every inference which reasonably can be drawn from the evidence viewed in the light most favorable to [the plaintiff]."

Hobbs v. Renick, 304 F.2d 856, 858 (8th Cir. 1962). See also, Palmentere v. Campbell, 344 F.2d 234, 237 (8th Cir. 1965). This review has convinced us that the trial court was correct in holding that the plaintiff presented no evidence from which the jury reasonably could find that the number of transactions was excessive. In the light of such holding, it is unnecessary for us to consider whether the plaintiff presented a submissible case in regard to the defendant's control of the account.

Whether or not trading in an account has been excessive is a fact question which cannot be determined by any precise rule or formula.

"The essential question of fact for determination is whether the volume and frequency of transactions, considered in the light of the nature of the account and the situation, needs and objectives of the customer, have been so 'excessive' as to indicate a purpose of the broker to derive profit for himself while disregarding the interests of the customer."

Hecht v. Harris, Upham & Co., *supra*, 283 F.Supp. at 435. See also, Churning by Securities Dealers, supra.

In attempting to make this subjective determination, the SEC and the courts often look to the more objective criteria of turnover ratio, nature of the trading and the dealer's profits. See, *e. g.*, Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968); Hecht v. Harris, Upham & Co., *supra*; Churning by Securities Dealers, *supra*.

The trading complained of here took place in a two-month period from April 29, 1968, to July 2, 1968, and was confined to transactions involving pork belly futures. The plaintiff was the sole witness and his testimony established the following facts in regard to that trading: (1) The plaintiff began trading in pork bellies (bacon) on April 29, 1968, with $778 in his account. (2) The pork belly market was volatile and highly speculative. The plaintiff's transactions were on a margin of less than seven percent. (3) Approximately fifty transactions (a purchase and subsequent sale or an initial sale and subsequent purchase of the commodity) were completed. (4) During the same period, fourteen transactions in other commodities were completed. (5) The total commissions paid to the defendant were $2,692. The plaintiff's losses on the trades amounted to approximately $6,200. (6) During this period, the plaintiff dealt with Jim Overman of the defendant's firm. Overman had taken over the plaintiff's account shortly before April 29, 1968, and had first suggested that the plaintiff enter the pork belly market. (7) The plaintiff talked to Overman on the telephone a total of eighty-one times on forty-five days. The plaintiff also received confirmation slips on each trade.

The plaintiff also testified that prior to April 29, 1968, he had been trading in various commodities for approximately two years. During the 1966–1968 period, he had conducted business with at least four commodity dealers. In 1967, he had engaged in at least fifty-five commodity trades, most of them through the defendant. The plaintiff also stated that during the April 29, 1968, to July 2, 1968, period, he was also trading in pork bellies with E. F. Hutton Company. In his trades through Hutton, the plaintiff lost approximately $1,500.

█ In our view, this information is simply insufficient to allow the jury to determine reasonably whether the transactions were excessive. First, the nature of the plaintiff's account indicated that it would be heavily traded. The commodity markets are highly volatile and are thus trading rather than investing vehicles. The plaintiff's trading in pork bellies was on a very low margin thereby greatly increasing the speculative nature of his account. The small margin tended to accentuate the amount of trading since a slight change

in the price of pork bellies caused a significant change in the plaintiff's investment. Further, it is clear from the plaintiff's activity in the various commodities that his account was a speculative trading account and not merely a means of hedging against the farm products he produced.

Secondly, there was no evidence presented which indicated that the active trading in May and June, 1968, was inconsistent with the plaintiff's needs and objectives. Though Overman first suggested the pork belly futures, the plaintiff was already actively trading in other commodities. In 1967, the plaintiff had engaged in over forty-five closed transactions with the defendant in various commodities. His eighty-one long distance phone conversations with Overman indicate that the plaintiff was in close contact with the defendant. He also received written confirmation of all purchases and sales. Yet, the plaintiff never complained of the number of trades engaged in. In fact, the plaintiff's only comments with the defendant were to the effect that "unauthorized trades couldn't go on much longer" and that he would have to close his account unless he started making some money. Further, the fact that during this period the plaintiff was trading in pork bellies with another dealer could only give the impression that the plaintiff's objective was one of active and speculative trading.

 Finally, the jury was not presented with any of the objective criteria used in determining excessivity, nor with any expert testimony regarding the nature and workings of the commodity markets. The jury was told only that fifty pork belly trades had been made, that commissions for the period totaled $2,692 and that the plaintiff started trading in pork bellies with $778 in his account. No evidence concerning the rate of turnover, the type of trading or the dealer's profits [1] was introduced to aid the jury. Nor was it possible for the jury to calculate these criteria from the testimony and the exhibits presented. Furthermore, there was not sufficient testimony presented to give the jury a reasonable understanding of the commodity futures markets. Trading in commodity futures is a complex and specialized field. The average juror cannot be assumed to have a good working knowledge of the area. The subject was thus an appropriate and proper one for expert testimony. Schillie v. Atchison, Topeka & Santa Fe Railway Co., 222 F.2d 810 (8th Cir. 1955). See also, Associated Dry Goods Corp. v. Drake, 394 F.2d 637 (8th Cir. 1968); Campbell v. Clark, 283 F.2d 766 (10th Cir. 1960). While we do not suggest that a case involving churning can never go to the jury without these kinds of technical and expert evidence, we do think that, here, the facts concerning the trading, standing alone, did not provide a sufficient basis for a jury determination.

In light of the evidence concerning the nature of the plaintiff's account and his objectives, the lack of meaningful trading criteria and the lack of evidence on the commodity markets in general, we cannot say that the trial court erred in directing a verdict for the defendant.

Affirmed.

1. See generally Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). The turnover rate is the ratio of the total cost of purchases made for the account during a given period of time to the average investment in the account. *E. g.,* Hecht v. Harris, Upham & Co., 283 F. Supp. 417, 436 (N.D.Cal.1968). The type of trading refers to the length of time the security of commodity is held and the nature of the reinvestments. *E. g.,* Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836, 840–841 (E.D.Va.1968). The dealer's profits refers not only to the percentage of the dealer's and salesman's profits generated by the account, but is used more accurately when the percentage of profits or commissions generated is compared with the size of the account, defined as a percentage of all accounts in the office. *E. g.,* Hecht v. Harris, Upham & Co., *supra,* 283 F.Supp. at 436; Stevens v. Abbott, Proctor & Paine, *supra,* 288 F.Supp. at 840.