E. F. HUTTON & CO., INC., Plaintiff,

v.

Bruce B. BURKHOLDER, Defendant.

Civ. A. No. 74–1314.

United States District Court,
District of Columbia,
Civil Division.

May 19, 1976.

Mahlon M. Frankhauser, Kirkland, Ellis & Rowe, Washington, D. C., for plaintiff.

Frederick D. Greco, McLean, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GASCH, District Judge.

### INTRODUCTION

In this action plaintiff E. F. Hutton and Co. ("Hutton") seeks a judgment against a former customer, Bruce B. Burkholder ("Burkholder"), for $59,416.00 allegedly due and owing on a commodity futures brokerage account. The plaintiff liquidated defendant's account on June 28, 1974. Defendant denies any liability to plaintiff, claiming that plaintiff wrongfully liquidated his account in reliance on erroneous

records and computations as to the status of the account. Specifically defendant disclaims five transactions that plaintiff entered in Burkholder's account prior to liquidation, as well as the propriety of the liquidating transactions themselves. Defendant has counterclaimed against plaintiff for $6,494.00, the amount of the credit allegedly due defendant if the Court adopts Burkholder's version of the disputed transactions.

Burkholder also seeks to avoid liability by advancing several theories of law. First, Burkholder contends that plaintiff had no right to liquidate the account because on the liquidation date Hutton had not yet corrected two errors that Hutton knew it had made in Burkholder's account. Second, Burkholder contends that the laws and regulations governing securities transactions are applicable in this case, and that the securities laws preclude plaintiff from recovering in this action because plaintiff did not liquidate the account within five days after defendant failed to meet margin calls. Defendant also seeks damages for losses he sustained when plaintiff liquidated his account more than five days after plaintiff failed to meet margin calls. Finally defendant requests punitive damages based on plaintiff's alleged maliciousness in filing this suit with knowledge of defendant's non-liability.

This case came on for trial before the Court, sitting without a jury. The Court has reviewed the evidence, heard the witnesses and determined their credibility, and herewith makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff Hutton is a securities and commodity futures brokerage firm incorporated in the State of Delaware and having its principal place of business in New York, with an office in the District of Columbia. Defendant Burkholder is a resident and citizen of Pennsylvania, although at the times involved in this case he worked for the Federal Government in the Washington, D. C., area and maintained a residence in McLean, Virginia.

2. On March 2, 1974, Burkholder opened a commodity futures trading account with the Washington, D. C. office of the plaintiff company by signing a Customer's Agreement with plaintiff. See Plaintiff's Exhibit 10. That Customer Agreement contained the following language:

> Para. 4—Whenever you [Hutton] deem it necessary for your protection, you are authorized, in your sole discretion, to sell, assign and deliver all or any part of the securities, commodities, or contracts in commodities or securities, or other property, pledged hereunder, upon any exchange or market or at any public or private sale at your option, and/or make any necessary purchase to cover short sales or open commodity contract positions, all without demand for margin, advertisement, or notice of purchase or sale to the undersigned, or to his personal representatives, (which are hereby expressly waived), and no specific demand or notice shall invalidate this waiver. After deducting all costs and expenses of purchases and/or sales and deliveries, including commissions, transfer and stamp taxes, you shall apply the residue of the proceeds to the payment of any and all liabilities, of the undersigned to you, and the undersigned shall remain liable for any deficiency . . . . (Plaintiff's Exhibit No. 10).

The first transaction in Burkholder's account occurred on March 27, 1974, when Burkholder placed an order with William Flynn ("Flynn"), an account executive in Hutton's Washington office.

3. Except in the circumstances contemplated by Para. 4 of the Customer's Agreement, *supra*, Burkholder exercised control over his account and made all final decisions as to which contracts he bought and sold. See Burkholder Testimony, Tr. 336, 388: Flynn Testimony, Tr. 206.

4. When Burkholder opened his account with Hutton in 1974, he was already an

experienced, though unsuccessful, trader in commodity futures contracts. Burkholder had engaged in futures transactions in 1972 and 1973 through Flynn, who at those times worked for Walston & Co. Burkholder lost approximately $10,000 in 1972 and, according to his testimony, $23,000 in 1973. See Burkholder Testimony, Tr. 284; Flynn Testimony, Tr. 115, 162–63. Under the circumstances Burkholder had experienced the volatility of the market at first hand, and must have known the seriousness of the risks inherent in commodities trading. When Flynn first called Burkholder in an effort to cause him to open an account with Hutton, Burkholder was nonresponsive but Flynn persisted and finally Burkholder agreed to return to the commodity market by opening an account with plaintiff through Flynn in 1974.

5. Beginning on March 27, 1974, and continuing through June 28, 1974, Burkholder bought and sold commodity futures contracts, principally wheat and cattle futures contracts, engaging in approximately 187 purchase and sale transactions in various quantities of various commodities through Hutton's Washington, D. C. office. Plaintiff's Exhibits 6D, 14; Further Stipulations, filed July 16, 1975.

6. During the period of activity in Burkholder's account, he spoke to Flynn by telephone numerous times each day to discuss price quotations, specific market situations and possible transactions. (Flynn Testimony, Tr. 140–142; Burkholder Testimony, Tr. 301, 335–37.) Transactions were effectuated by Burkholder's communicating the specifics of his order by telephone to Flynn. Flynn would normally read each order back to Burkholder as he wrote up the "order ticket" and read the order to Burkholder a second time once the "order ticket" was completed. Flynn would then take the "order ticket" to Hutton's Washington, D. C. Wire Room for teletyping to the appropriate commodities exchange. Once the order was executed on the floor of the exchange, notification of this fact was sent to Flynn, who would then inform Burkholder of the execution by telephone. (Flynn Testimony,

Tr. 140–143, 232; Burkholder Testimony, Tr. 299, 337, 346).

7. Within one day after the execution of each transaction for Burkholder's account, Hutton would, in the normal course of business, mail confirmations of the transactions to Burkholder at the latter's address in Hershey, Pennsylvania, as he had requested. (Flynn Testimony, Tr. 135; James Sweeney Testimony, Tr. 17–21; Burkholder Testimony, Tr. 390).

8. Whenever a purchase of a given quantity of commodity futures was off-set with a sale of the same quantity of the same commodity futures (or vice versa), a realized profit or loss was sustained by Burkholder's account on those positions. The profit or loss would ordinarily be reported to defendant by mailing to him in the normal course of business a "Purchase and Sale Statement," (P & S Statements), reciting the trades which were offset against one another and showing the resulting profit or loss and the deduction of commission and fees. (Sweeney Testimony, Tr. 5–8; Flynn Testimony, Tr. 136).

9. Burkholder kept his own records of the transactions in his account by recording each executed order in a small black book, Plaintiff's Exhibit 6D. Burkholder normally kept records according to a two-step process. Before placing an order, Burkholder would write the order on a 3 x 5 card, and would then telephone Flynn and read the order to him. Upon receiving notification that the order had been executed, Burkholder would record it in his black book and throw the card away. Burkholder Testimony, Tr. 285, 334, 336–37, 346. Only on weekends, when Burkholder returned home to Pennsylvania, did he have an opportunity to check his records against the transaction slips that Hutton had sent him during the week. See Burkholder Testimony, Tr. 286, 390.

10. Neither Hutton, nor Burkholder, kept flawless records of the Burkholder account. On at least three occasions Hutton's employees recorded the wrong account number when typing transaction information into Hutton's computer. Two of the

errors involved the account of a Mr. Slater, and another error involved the account of a Mr. Ross. See Defendant's Exhibits K–1 through K–5; Sweeney Testimony, Tr. 10–11, 73–87; 103–04; 110; Flynn Testimony, Tr. 176–77, 185–189. Burkholder likewise made certain erroneous entries in his black book. See Burkholder Testimony, Tr. 348–360; Plaintiff's Exhibit 6D. Also, Mr. Burkholder did not maintain his black book in the most organized or efficient manner. He did not consistently record transactions in chronological order, nor did he maintain a record of open positions on a day-to-day basis. See Burkholder Testimony, Tr. 347–60; Plaintiff's Exhibit 6D. In view of the errors and evidence of confusion exhibited by both parties' records, the Court has evaluated the probativeness of the records with a degree of skepticism.

11. The "Monthly Statement" of Burkholder's account for the month ended July 31, 1974, shows a deficit in the amount of $59,581 as a result of transactions engaged in for the account. See Plaintiff's Exhibit 23. Although Hutton initially sued for the entire $59,581 plus interest, plaintiff subsequently, in its trial brief, reduced that amount to $59,566 to reflect adjustments for commission errors in the account. The amount sued for was subsequently reduced at trial to $59,416 as a result of the parties' resolution of the disputed May 17, 1974, transaction referred to in Paragraph 15 *infra*. The Hutton errors that resulted in trades being erroneously interchanged between Burkholder's account and another Hutton customer's account are found to have been corrected by Hutton. The deficit of $59,581, which was reduced during trial to $59,416, properly reflects those corrections. See Plaintiff's Exhibit 23; Sweeney Testimony, Tr. 10, 13, 54–56. 77.

12. Of the approximately 187 transactions executed for Burkholder's account, only those noted in the Further Stipulation of Parties filed July 16, 1975, and the List of Trades attached thereto (Plaintiff's Exhibit 14) are disputed by Burkholder. As to the transactions which are disputed by Burkholder, the following detailed findings, Nos. 13–16, are made concerning those transactions.

13. With respect to the June 6 and June 7, 1974, Sales of July Wheat contracts which are disputed by Burkholder, the credible evidence establishes that on June 6, 1974, Burkholder did order the sale of 10,-000 bushels of July wheat which was executed at $3.64½, and that on June 7, 1974, Burkholder ordered the sale of 20,000 bushels of July wheat which was also executed at $3.64½. This finding is supported by the testimony of William Flynn, Tr. 135–38, the order tickets (Plaintiff's Exhibits 5, 6) that were entered by Flynn for those sales, and the confirmation tickets and P & S Statements (Plaintiff's Exhibits 5B, 5C, 6A, 6B, 29). Copies of all the enumerated confirmation tickets and P & S Statements would have been mailed to Burkholder in the ordinary course of business, and Burkholder did in fact receive the P & S slip for the June 6 sale, and at least one of the confirmation slips for the June 7 sale. See Burkholder Testimony, Tr. 321, 389; Plaintiff's Exhibits 5B, 29.

This finding is further supported by James Sweeney's testimony that Burkholder had admitted to him during a meeting in New York on July 10, 1974, that Burkholder had not objected to the June 6 and 7 transactions until that meeting. Sweeney Testimony, Tr. 440–41; see also Flynn Testimony, Tr. 138–39. Moreover, if as Burkholder testified, he did not order the June 6 and 7 sales, his account would have carried six contracts * of July wheat in an unstraddled long position from June 13 through June 27. To carry an unstraddled long position for that period of time would have been contrary to Burkholder's normal practice of day trading and keeping his positions straddled overnight. See Burkholder Testimony, Tr. 378–383; Sweeney Testimony, Tr. 34–35, 68–69; Flynn Testimony, Tr. 118, 153; Plaintiff's Exhibit 22. The Court finds Burkholder's testimony that he intentionally carried the long July wheat position to be

---

* A contract is 5000 bushels.

incredible given his normal pattern of trading and the risks that small traders incur in carrying unstraddled long positions.

14. With respect to the disputed June 26, 1974, purchase for Burkholder's account of 30,000 bushels of December wheat at $4.77 per bushel, the credible evidence establishes that Burkholder did not order a buy, as indicated in Hutton's records, but that Burkholder placed an order with Flynn to *sell* 30,000 bushels at $4.77. See Burkholder Testimony, Tr. 294–302. Support for this finding derives not only from Burkholder's testimony, but also from Burkholder's pattern of trading and from the testimony of William Flynn.

The Court has considered plaintiff's argument that a buy at $4.77, rather than a sale, would have been more consistent with Burkholder's trading pattern. That argument fails to convince the Court, however, because the Court cannot believe that Burkholder, a day trader whose limited finances required him to maintain straddled positions overnight, would have closed his trading on June 26 by entering the undisputed buy order, which was executed at $4.61, if he had not succeeded in executing a sale of December wheat earlier that day. The undisputed buy at $4.61 was executed only minutes before the market closed for the day. See Flynn Testimony, Tr. 199.

Flynn's own testimony underscores the unlikelihood that Burkholder would have entered the last transaction of the day as a buy if the transaction at $4.77 had also been a buy. Flynn himself testified that he assumed at the time Burkholder entered the final buy order that Burkholder had executed a sale earlier that day. Flynn Testimony, Tr. 154, 200, 204, 206. Indeed, Flynn was so convinced of this that he called Burkholder immediately after the final order was executed and congratulated Burkholder on making a profit of approximately $12,000. See Flynn Testimony, Tr. 204; Burkholder Testimony, Tr. 303. The Court finds incredible Flynn's attempted explanation of the final buy order as an effort by Burkholder to "average down" his losses. Flynn Testimony, Tr. 152, 197. By the time

Burkholder placed the order to buy at $4.63, the price of December wheat had fallen from the day's high of $4.79, which had been reached at 11:10 central daylight time. Moreover, the price of December wheat had fallen the limit on June 25th. See Plaintiff's Exhibit 19; Defendant's Exhibit D; Flynn Testimony, Tr. 147–48, 151. It seems to the Court incredible that Burkholder would intentionally have made a double buy in the falling market of June 26th.

The falling market lends support to this finding for another reason. Burkholder testified that during the morning of the 26th he believed the market would fall. See Burkholder Testimony, Tr. 298, 386. Burkholder acted on that belief by opening his trading on the 26th with an order to sell 40,000 bushels of September wheat. Plaintiff's Exhibits 7A, 8; Burkholder Testimony, Tr. 387. The price of December wheat reached its peak, as noted previously, at 11:10 A.M. central daylight time, or 12:10 A.M. eastern daylight time. The Court credits Burkholder's testimony that he continued to believe the market would fall, that he acted on this belief by placing an order at 12:06 P.M., eastern daylight time, to sell 30,000 bushels of December wheat, and that the final buy order of the day was intended to close out a day trade for the 30,000 bushels of December wheat that he had sold at 12:06. Burkholder Testimony, Tr. 299–301. The Court is not persuaded that the intervening unexecuted sale orders are inconsistent with this finding.

15. With respect to the May 17, 1974, purchase for Burkholder's account of 2 contracts (10,000 bushels) of September wheat, which purchase was disputed by Burkholder, the parties agreed at trial that the defendant was entitled to an execution at a price of $3.64½ per bushel, rather than the price of $3.66 per bushel, thus eliminating the dispute concerning this transaction and eliminating the need for further findings concerning it. (Burkholder Testimony, Tr. 292, 338–42).

16. With respect to the April 25, 1974, purchase of one contract of June cattle at $45.00 and the sale of the one contract of

June cattle at $44.87½ on the same date, the Court finds that plaintiff has not sustained its burden of proving by a preponderance of the evidence that defendant authorized those transactions. Plaintiff's Exhibit 1, which plaintiff introduced as the buy order that initiated the April 25 buy at $45.00, is entirely unconvincing. The handwritten date on the buy order appears to be 4/24/74 rather than 4/25/74, and the order was stamped by Hutton with an April 24, 1974, date stamp. The April 24 date on the buy order undercuts the reliability of the confirmation slip as well. See Plaintiff's Exhibit 1A. Moreover, the buy order bears on its face a large "C", which was the symbol used by Flynn to indicate that an order was cancelled, and the $45.00 price on Exhibit 1 is not encircled as it probably would have been if the order had been executed. See Flynn Testimony, Tr. 223; compare Plaintiff's Exhibits 7, 7A, 7B, 7C, 7D, 7E, 8; Flynn Testimony, Tr. 148–50. Although Burkholder's record book, Plaintiff's Exhibit 6D, shows a sale of two contracts of June cattle at $44.87½ on April 25, matched against a purchase of only one contract of cattle at $45.92, the Court finds Burkholder's explanation of this error entirely credible. See Burkholder Testimony, Tr. 291–92. The Court therefore finds that Burkholder authorized only two transactions in June cattle on April 25, 1974, namely, a purchase of one contract at $45.92, and a sale of one contract at $44.87½. The purchase of one contract on that date at $45.00 and the sale of a second contract on that date at $44.87½ were not authorized by Burkholder.

17. Having concluded that defendant ordered a sale rather than a buy of 30,000 bushels of December wheat at $4.77 on June 26, 1974, and that defendant did not authorize the purchase on April 25, 1974, of one contract of June live cattle at $45.00 and the sale of one contract on that date at $44.87½, the Court finds, pursuant to the Further Stipulations of the Parties, dated July 16, 1975, that: (A) defendant's account should be credited with $33,543 to reflect the correction for the December wheat transaction, and debited $2,883 to reflect the actual close out price of $4.26 obtained for the account on June 28, 1974, when the account was liquidated. The price of $4.26 is the price at which 30,000 bushels of December wheat was actually sold for defendant's account at 12:50 P.M. eastern daylight time on June 28, 1974; (B) defendant's account should be credited $75.00 to reflect the corrections for the two unauthorized April 25, 1974, transactions in June live cattle.

18. With respect to Hutton's liquidation of Burkholder's account on June 28, 1974, by two separate sales of September wheat contracts and a third sale of December wheat contracts, which liquidation Burkholder contends was unjustified, the evidence establishes the existence of a substantial deficit in Burkholder's account on the morning of June 28, 1974. The decline in the price of the December wheat and September wheat "long" positions in Burkholder's account continued on the morning of June 28, 1974 (Plaintiff's Exhibits 19, 24; Defendant's Exhibit D.) Before the opening of the market on that morning, according to Hutton's subsequent recalculation which adjusted the deficit to correct the Slater errors but did not make an adjustment for the decline in the market that morning, the actual losses with respect to Burkholder's account, as that account was reflected in Hutton's records, totaled at least $44,000. Plaintiff's Exhibits 20A, 22; Sweeney Testimony, Tr. 53–57, 441–48; Johnson Testimony, Tr. 242–56; Schechter Testimony, Tr. 256–7, 260, 262–70, 271–4.

19. The Court concludes that E. F. Hutton was justified, in view of the substantial actual deficit and threat of additional losses in the account, in deciding to liquidate Burkholder's account, and that this decision was made in good faith to protect both Burkholder and E. F. Hutton from further risks as a result of the declining market price. The extent of the market risks to which the account was subject on the morning of June 28, 1974, is indicated by the fact that additional losses of approximately $15,000 were incurred during that morning as a result of the declining market price. Mr.

Johnson testified that he was aware of the declining market price prior to his conversation with Loren Schechter and that he informed Mr. Schechter of the resulting additional losses in Mr. Burkholder's account on the morning of June 28, 1974. Johnson Testimony, Tr. 242–56; Schechter Testimony, Tr. 271–4, 454–6.

## CONCLUSIONS OF LAW

1. No challenge having been presented to the jurisdiction of the Court, the Court finds that jurisdiction over this action is conferred by 28 U.S.C. § 1332 (diversity of citizenship) and that venue is properly laid in the District of Columbia pursuant to 28 U.S.C. § 1391(a) because the transactions in question occurred in the Washington, D. C. office of Hutton.

2. Under the terms of the Customer Agreement (Plaintiff's Exhibit 10) signed by Burkholder (recited in Paragraph 2 of the Findings of Fact herein), Burkholder is responsible to Hutton for any deficiency in his account after liquidation. The findings of fact made herein show that the amount of the deficiency in Burkholder's account, as reflected in Hutton's records, was $59,416, but that that amount should be modified in accordance with Finding of Fact 17 by crediting the account with $33,543 plus $75, and debiting the account $2,883. The debit in the amount of $2,883 is proper in view of Finding of Fact No. 19. Taking these credits and debit into account, Burkholder is liable to Hutton for $28,681.

3. Plaintiff is entitled to interest on the amount of the judgment, but the interest shall run from the date of judgment only, in accordance with the applicable provision of District of Columbia law. See D.C.Code § 15–109; see also *Shima v. Brown,* 77 U.S.App.D.C. 115, 133 F.2d 48, 50 (1943). Section 15–109 provides that prejudgment interest shall not be awarded except by order of the Court if trial is by the Court. The D.C. Circuit has recognized that uncertainty as to the amount due the plaintiff and lapse of time between trial and judgment are factors that weigh against the award of interest under the District of Columbia statute. See *Dyker Bldg. Co. v. United States,* 86 U.S.App.D.C. 297, 182 F.2d 85, 91 (1950). Both of these factors are present in this case, and the Court will therefore allow interest from the date of judgment only. Interest shall accrue at the rate of six (6) percent per annum. D.C.Code § 28–3302.

In so ruling on the question of plaintiff's entitlement to interest on the judgment, the Court is aware that the Customer's Agreement that Burkholder signed with Hutton (Plaintiff's Exhibit 10) provides that the "agreement and its enforcement shall be governed by the laws of the State of New York." Under New York law, interest on sums awarded in actions of this type is computed at the rate of six (6) percent from the time the cause of action accrued. N.Y.Civ.Prac.Law §§ 5001, 5002, 5003 (McKinney 1973); N.Y.Civ.Prac.Law § 5004 (McKinney, Supp.1975–76); *Spector v. Mermelstein,* 485 F.2d 474, 482 (2d Cir. 1973); *Rock Transport Properties Corp. v. Hartford Fire Ins. Co.,* 312 F.Supp. 341, 348 (D.C.N.Y.), *aff'd* 433 F.2d 152 (2d Cir. 1970). Thus New York law on the subject of prejudgment interest is contrary to that of the District of Columbia.

Despite the choice of law provision of the Customer's Agreement, New York's law on the subject of pre-judgment interest will not be applied here. The State of New York has no significant interest in or relationship to this litigation. Plaintiff is a Delaware corporation and defendant is a Pennsylvania domiciliary who formerly resided in Virginia and worked in the Washington, D. C. area. The parties entered into the contractual arrangement that underlies this lawsuit in Washington, D. C., and the futures transactions between the parties took place through the Washington, D. C. office of plaintiff. Under these circumstances the District of Columbia's interest in this litigation and New York's lack of any significant interest justify this Court's refusal to apply law that contravenes the codified policy of the District of Columbia. See *Lauritzen v. Larsen,* 345 U.S. 571, 588–

89, 73 S.Ct. 921, 931, 97 L.Ed. 1254, 1270–71 (1953).

■ 4. The federal securities laws and regulations promulgated pursuant thereto, which are relied upon by Burkholder in his defense to Hutton's claim, are inapplicable to these transactions and to Burkholder's account because a commodity futures trading account is neither a "security" nor an "investment contract" within the embrace of the Securities Act of 1934. *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 275 & n. 1 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972); *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338 (E.D. La.1972); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 365–67 (S.D.N.Y.1966). Those few cases which have reached a different conclusion on this question have involved discretionary commodities accounts, thus distinguishing them from the present case, where it is undisputed that Burkholder controlled his own account. See *Marshall v. Lamson Bros. & Co.*, 368 F.Supp. 486 (S.D. Iowa 1974). Defendant's arguments that this account should be considered a discretionary account by virtue of the liquidation powers given Hutton by Paragraph 4 of the Customer Agreement signed by Burkholder (Plaintiff's Exhibit 10) is unconvincing. Further, Burkholder's reliance on *Booth v. Peavey Company Commodity Services*, 430 F.2d 132 (8th Cir. 1970), is misplaced. While the Court in that case held that a private right of action for churning a commodity account is permitted by the Securities Act of 1933 and the Securities Exchange Act of 1934, the Court never reached the questions of whether the commodities account in question was a discretionary account and whether a non-discretionary account could be considered a "security" for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934. Instead, the Court affirmed a directed verdict for the defendant on the basis that insufficient evidence of "churning" had been adduced to warrant submissions of the case to the jury. Significantly, the Court stated that to establish a case of churning, the plaintiff must prove, *inter alia*, that the dealer has control of the account. Given the element of dealer control, causes of action based on churning would necessarily be limited to discretionary accounts.

■ 5. Regulation T of the Federal Reserve Board (12 C.F.R. § 220 *et seq.*), also relied upon by Burkholder in his defense to Hutton's claim, is also inapplicable to the present case. That regulation applies only to "credit that may be initially extended and subsequently maintained on any security." Securities Exchange Act of 1934, § 7(a), 15 U.S.C. § 78g. Burkholder's account is not a "security."

■ 6. With respect to Burkholder's contention that all disputes between a customer and his brokerage firm with respect to the customer's account must be resolved and the ministerial task of actually correcting the errors on the record must be completed before the firm may liquidate the account, the Customer Agreement signed by him contains no such requirement and the imposition of such a requirement would be unjustified since one of the purposes of liquidation is to remove the account's positions from the continued risk of the market so that the disputes may be accurately resolved.

7. Similarly, contrary to Burkholder's contention, it would be unwise to require a brokerage firm to continue to subject a customer's account to the risk of the market while the firm attempts to secure additional funds from the customer when the customer has not deposited additional funds within a reasonable period of time as determined under the circumstances of the particular situation. The Customer Agreement signed by Burkholder explicitly recognizes this by stipulating that Hutton need not make margin calls as a prerequisite to liquidation.

8. On the basis of all of the facts and circumstances known to Hutton on June 28, 1974, Hutton's decision to liquidate Burkholder's account was a proper exercise of the authority given to it by Burkholder pursuant to the terms of the Customer

Agreement recited in Finding of Fact 2 hereof.

9. In view of the findings of fact recited herein, and the evidence adduced at trial, Burkholder's counterclaim for punitive damages is without basis and must be dismissed.