**Ralph G. CONSOLO, Plaintiff,**

v.

**HORNBLOWER & WEEKS–HEMPHILL, NOYES, INC., et al., Defendants.**

**Civ. A. No. C76–763.**

United States District Court,
N. D. Ohio, E. D.

Dec. 9, 1976.

Michael T. Honohan, Alan N. Hirth, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Ralph G. Consolo.

Frederick W. Assini, Calfee, Halter & Griswold, Cleveland, Ohio, Beekman & Bogue, New York City, for Hornblower & Weeks-Hemphill, Noyes, Inc., Lawrence Milne and Robert Bullock.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

This is a proceeding instituted pursuant to the Securities Act of 1933, 15 U.S.C. § 77a *et seq.,* the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.,* and the Commodity Exchange Act of 1936, 7 U.S.C. § 1 *et seq.* The jurisdiction of this Court is purportedly invoked pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa. Plaintiff asserts no jurisdictional basis for his separate cause of action under the Commodity Exchange Act. The remaining causes of action are premised upon the pendant jurisdiction of the federal courts.

A review of the pleadings filed herein discloses that this matter is presently the subject of arbitration proceedings before a panel of the American Arbitration Association in New York City (*Hornblower & Weeks-Hemphill, Noyes Incorporated v. Ralph G. Consolo*; Case No. 1310–0145–75), and that said proceedings were instituted pursuant to the contractual agreement of the parties. Simultaneous with the filing of his Complaint, plaintiff filed a Motion to Stay Arbitration, with a supporting memorandum of law appended thereto. In their Answer, defendants challenged the jurisdiction of this Court and filed their Motion to Stay the Action Pending Arbitration, with supporting affidavits and a memorandum of law appended thereto. In addition, defendants filed a Motion for Protective Order, pending the Court's ruling upon the two motions for a stay of proceedings. In response to the foregoing motions, an evidentiary hearing was held to determine the jurisdiction of this Court vis-a-vis that of the arbitration panel in New York.

Stated briefly, the testimony and evidence presented at the aforementioned hearing disclose that on August 1, 1974, plaintiff opened an individual non-discretionary commodity trading account with defendant Hornblower & Weeks-Hemphill, Noyes, Inc. (Hornblower). Preparatory to opening said trading account, defendant Milne, the commodity account executive representing Hornblower, inquired about plaintiff's trading philosophy, the results of which were recorded in plaintiff's presence on the Hornblower Commodity Questionaire (Def. Ex. 2). Plaintiff therein asserted that although he had no educational background in commodity trading, he had had past experience in the commodity futures market and had just recently closed a similar account with the brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Inc. He characterized his trading philosophy as "aggressive" and stated his intention to devote as much personal time as possible to his

trading activities. He furthermore professed his interest in a high rate of turnover with minimal concern for the attendant risk, and approximated his acceptable total equity loss at 100%. The agreement to open an individual non-discretionary trading account in commodity futures was thereafter reduced to writing, i. e. the Customers Agreement (Def. Ex. 1), which stipulated that the contract would be governed by the laws of the State of New York. The agreement also incorporated the following proviso, designated as paragraph 7:

Controversies which may arise between you and the undersigned shall be determined by arbitration in The City of New York in accordance with the rules of the American Arbitration Association or at the election of the undersigned in accordance with the rules of the Board of Arbitration of the New York Stock Exchange, Inc. The award of any arbitrators appointed pursuant hereto shall be final and judgment upon the award rendered may be entered in any court having jurisdiction. The undersigned on behalf of the undersigned and the executors, administrators, successors and assigns of the undersigned hereby submits to the jurisdiction of such court.

With the signing of the Customer's Agreement, an initial deposit of $25,000 in the form of a personal check was then and there tendered to defendant Milne.

The subsequent trading in the Consolo account, which extended through October, 1974, was of considerable volume. Although plaintiff dealt primarily in sugar futures, he executed a number of transactions for the purchase of corn, wheat, soybean and platinum futures. A recapitulation of the account's activity (Def. Ex. 6) reveals total deposits of $420,500.00; total withdrawals of $255,000.00; total trade profits of $424,104.80; total trade losses of $611,227.00; and total charged commissions of $32,169.50; resulting in a debit balance of $53,791.70 at the closing of the account in October, 1974. Upon liquidation of the account and pursuant to paragraph 7 of the Customer's Agreement, defendant Hornblower filed a claim for the outstanding deficit before the American Arbitration Association in New York City.

In pursuit of a stay of the New York arbitration proceeding, plaintiff asserts that paragraph 7 of the Customer's Agreement violates Section 14 of the Securities Act of 1933, 15 U.S.C. § 77n, as well as Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a). Section 77n of Title 15, United States Code, provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." Section 78cc(a) of Title 15, United States Code, provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

Defendants do not challenge the principle derived from the foregoing statutory provisions and willingly concede that an agreement to arbitrate disputes arising under the Securities Act of 1933 and the Securities Exchange Act of 1934 is invalid and unenforceable. Indeed, as stated by the Supreme Court of the United States in *Wilko v. Swan,* 346 U.S. 427, 434–35, 438, 74 S.Ct. 182, 186, 188, 98 L.Ed. 168 (1953):

The words of § 14, . . . void any "stipulation" waiving compliance with any "provision" of the Securities Act. This arrangement to arbitrate is a "stipulation," and we think the right to select the judicial forum is the kind of "provision" that cannot be waived under § 14 of the Securities Act.

\* \* \* \* \* \*

[Congress] has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights. Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such

an agreement for arbitration of issues arising under the Act.

However, preliminary to the enforcement of sections 77n and 78cc(a) as a bar to the pending arbitration proceedings, the Court must determine that the investments in issue come within the purview of the Securities Act and the Securities Exchange Act. This point, defendants do not so willingly concede.

The investments made by plaintiff through his trading account with Hornblower are governed by the Securities Act of 1933 and the Securities Exchange Act of 1934 only if the contracts to purchase commodity futures in which plaintiff traded may be properly defined as "securities" pursuant to both Acts.[1] Of the several definitions of the term "security" provided therein, the only definition reasonably applicable to the investments under consideration is that of "investment contract." The Court must therefore determine if a commodity future contract is in fact an "investment contract" and thereby a "security" subject to the regulation of the Securities Act and the Securities Exchange Act. Relevant case authority is emphatically negative.

Upon initial inquiry, the Court observes the general rule that contracts to purchase commodity futures are not investment contracts within the meaning of the federal securities laws and hence, are not securities. *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972); *E. F. Hutton & Co., Inc. v. Burkholder,* 413 F.Supp. 852 (D.D.C.1976); *Jenson v. Continental Financial Corp.,* 404 F.Supp. 792 (D.Minn.1975); *Glazer v. National Commodity Research and Statistical Services, Inc.,* 388 F.Supp. 1341 (N.D.Ill.1974); *Golding v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 385 F.Supp. 1182 (S.D.N.Y.1974); *Arnold v. Bache & Co., Inc.,* 377 F.Supp. 61 (M.D.Pa. 1973); *McCurnin v. Kohlmeyer & Co.,* 340 F.Supp. 1338 (E.D.La.1972), *aff'd,* 477 F.2d 113 (5th Cir. 1973); *Sinva v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359 (S.D.N.Y.1966); *see Glen-Arden Commodities, Inc. v. Constantino,* 493 F.2d 1027 (2d Cir. 1974). The Court is reminded, however, that "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *see United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Nash & Associates, Inc. v. Lum's of Ohio, Inc.,* 484 F.2d 392 (6th Cir. 1973).

The Supreme Court fathomed the definition of the term "investment contract" in its landmark opinion in *Securities and Exchange Commission v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Therein the Court, through Justice Murphy, stated:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

---

1. The Securities Act of 1933, 15 U.S.C. § 77b(1) defines, as follows, the term "security":

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) defines, as follows, the term "security":

[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

\* \* \* \* \* \*

The test is whether the scheme involves an investment of money in a. common enterprise with profits to come solely from the efforts of others. *Id.* at 298–99, 301, 66 S.Ct. at 1103, 1104.

*See, Tcherepnin v. Knight, supra* (same definition applied to "investment contract" pursuant to the Securities Exchange Act of 1934). As stated in *United Housing Foundation, Inc. v. Forman, supra,* "the definition of a security in § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), is virtually identical and, for present purposes, the coverage of the two Acts may be considered the same." 421 U.S. at 847, n. 12, 95 S.Ct. at 2058.

As the Fifth Circuit Court of Appeals observed in *Securities and Exchange Commission v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974), the Supreme Court test subsumes three distinct elements: 1) an investment of money, 2) a common enterprise among several investors, and 3) profits derived solely from the efforts of others. *See also, Securities and Exchange Commission v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974). The first element is clearly present in the case at bar. As noted earlier, plaintiff made total cash deposits of $420,500.00 to his trading account with Hornblower, and this sum of money was employed to invest in contracts in commodity futures. However, the remaining two elements of the *Howey* definition admit of greater intricacy and bear closer inspection. Moreover, the interrelation of the two remaining elements, as established in a number of different circuits, precludes an application of the facts herein to each element in isolation.

In search of a common enterprise, a number of courts have placed reliance upon the pooling of the funds of joint investors; the actual co-mingling of assets for a common purpose. See *Milnarik v. M–S Commodities, Inc., supra; Jenson v. Continental Financial Corp., supra; Glazer v. National Commodity Research and Statistical Services, Inc., supra; Arnold v. Bache & Co., Inc., supra.* Other courts have focused attention upon the pooling of efforts, not only of the several investors, but also of the promoter of the investment. See *Securities and Exchange Commission v. Koscot Interplanetary, Inc., supra; Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Jenson v. Continental Financial Corp., supra* (applying both the pooling of funds and pooling of efforts tests). A succinct definition supporting this latter approach is found in the following passage from the *Glenn W. Turner* case: "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." 474 F.2d at 482, n. 7.

In this latter respect, the element of common enterprise is closely related to the third element of the *Howey* rationale, whereby profits are derived *solely* from the efforts of someone other than the investor. Since the announcement of the *Howey* decision, several circuit courts of appeals have departed from a strict interpretation of the term "solely", and have adopted an expanded definition of investment contract. This significant departure was heralded by the Ninth Circuit Court of Appeals in the *Glenn W. Turner* case, wherein the Court stated:

We hold . . . that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word "solely" should not be read as a strict or literal limitation on the defini-

tion of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities.

\* \* \* \* \* \*

Rather, we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. 474 F.2d at 482.

*See, Bitter v. Hoby's International, Inc.,* 498 F.2d 183 (9th Cir. 1974); *Securities and Exchange Commission v. Koscot Interplanetary, Inc., supra; Nash & Associates, Inc. v. Lum's of Ohio, Inc., supra.* Although the Supreme Court denied certiorari in the *Glenn W. Turner* case, that tribunal has, in a recent opinion, explicitly declined to express any view regarding the Ninth Circuit's holding. *United Housing Foundation, Inc. v. Forman, supra,* 421 U.S. at 852, n. 16, 95 S.Ct. 2051. With the foregoing analyses in mind, the Court proceeds to a review of the evidence disclosed at the hearing in the case now before the Court.

Plaintiff did not contend at the hearing or in his memorandums of law that the $420,500.00 deposited in his trading account at Hornblower, nor the profits derived from the ensuing commodity futures transactions, were pooled or co-mingled with the funds of any other investor or those of either of the defendants. On the contrary, plaintiff's account was an *individual* trading account, as disclosed by the testimony and defendants' Exhibit 5. All of the Consolo orders for the purchase of contracts in commodity futures were individual orders, i. e. they were never "bunched" or "grouped" with similar orders of any other investor. Nor were plaintiff's investments or funds co-mingled with those of defendant Hornblower, for at that time, the stock brokerage firm did not buy or sell commodity futures for its own account.

Clearly, plaintiff's investments and returns were independent of those of all other such investors transacting business with defendant Hornblower. The fortunes of plaintiff Consolo were not interwoven with nor dependent upon the success of other investors or defendant Hornblower, itself. The Seventh Circuit Court of Appeals, in adopting portions of the district court decision in *Milnarik v. M–S Commodities, Inc.,* 320 F.Supp. 1149 (N.D.Ill.1970), discussed some features of the contractual relationship between the investor and his stock broker which point to the absence of common enterprise. Quoting the language of the district court, the court of appeals stated:

"In essence, this contract creates an agency-for-hire rather than constituting the sale of a unit of a larger enterprise. No matter how many different persons Nelson became an agent for under similar or even identical discretionary contracts, his relationship with each would remain as that of agent and principal. Each contract creating this relationship is unitary in nature and each will be a success or failure without regard to the others. Some may show a profit, some a loss, but they are independent of each other. No matter how many discretionary trading accounts Nelson may have had with other principals, the 'security' 'issued' to the plaintiffs, their discretionary trading account, could not be offered to anyone else. . . . " 457 F.2d at 277.

Simply stated, a contract situation such as that presented here, involving only two persons, i. e. the investor and his stock broker, does not admit of the common enterprise which is essential to the existence of an investment contract. *See, Sunshine Kitchens v. Alanthus Corp.,* 403 F.Supp. 719 (S.D. Fla.1975); *Arnold v. Bache & Co., Inc., supra.*

Considering next defendants' participation in plaintiff's investment program, the Court is convinced that no interpretation of the facts can support the conclusion that plaintiff derived profits solely from the efforts of third parties, viz., defendants Hornblower and Milne. Plaintiff's account with Hornblower was a non-discretionary trading account. Neither defendant was empowered to transact any business in plain-

tiff's name without his prior consent and approval. Plaintiff, himself, admitted that he did not grant either defendant a power of attorney to act in his behalf and the testimony further disclosed that Hornblower did not trade in discretionary accounts during the period in which plaintiff held his account with Hornblower. Even if plaintiff had authorized Hornblower to deal in his behalf in its discretion, the weight of case authority holds that a discretionary trading account in commodity futures is not an investment contract, and hence, not a security within the purview of the Securities Act of 1933 and the Securities Exchange Act of 1934. See *Milnarik v. M–S Commodities, Inc., supra; Jenson v. Continental Financial Corp., supra; Glazer v. National Commodity Research and Statistical Services, Inc., supra; Stevens v. Woodstock, Inc.,* 372 F.Supp. 654 (N.D.Ill.1974).

Moreover, the facts elicited at the hearing disclose that plaintiff, himself, made all of the significant decisions; the essential managerial efforts which affected the failure or success of his trading with Hornblower. Defendant Milne did counsel and advise plaintiff on his investments in commodity futures, and, at the request of plaintiff, Milne telephoned plaintiff an average of ten times each day to inform him of the daily activity on the commodities market (both on the London and domestic markets), to convey pre/market-opening reports, and other pertinent data. Plaintiff would, in turn, telephone Milne an average of five times each day. During particularly active periods, Milne telephoned Consolo, at the latter's request, an average of ten to fifteen times each hour to convey breaking market news. Consolo would react to this constant influx of sophisticated investment data with specific instructions to act, or not to act, i. e., to buy a specific quantity of futures in a particular commodity, or not to buy at all. In each instance, Milne acted only upon the express direction and authority of plaintiff.

Even when Milne offered his opinion of the wisdom of a particular transaction, plaintiff did not always abide by that advice. For example, plaintiff's very first transaction in sugar futures was contrary to the advice and counsel of defendant Milne and Hornblower's New York expert in sugar futures. On the sole occasion when Milne engaged in commodity transactions without continuing consultation with plaintiff (i. e., on the occasion that Consolo left town for Chicago), those transactions were executed pursuant to the pre-arranged plan of plaintiff. Before his departure for Chicago, Consolo directed Milne to execute certain transactions in response to certain market conditions and given market activity. In accordance with these instructions, Milne executed the pre-determined transactions and notified Consolo thereafter by letter. Under these facts and circumstances, plaintiff has not only failed to satisfy the third element of the *Howey* definition of investment contract, but he has also failed to meet the liberal interpretation of the *Glenn W. Turner* case. Plaintiff was not led to expect, nor did he in fact derive, profits from the efforts of others, solely or otherwise.

The foregoing principles which clearly distinguish contracts to purchase commodity futures from investments contracts are roundly summarized in *McCurnin v. Kohlmeyer & Co., supra*:

> A commodity future contract is no more or less than an option; the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified commodity at a specified future time at a specified price. Unless the investor reverses his position timely by selling what he has bought or buying what he has sold, he must accept delivery of the commodity and pay the full purchase price as set by the contract (or deliver the commodity against full payment, if he has sold). He is in no way investing his money in a common enterprise, nor is he led to expect profits solely from the efforts of any third party. The "enterprise" is an individual one. The expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor, permitting purchase or sale at a profit. 340 F.Supp. at 1341.

The Court, therefore, determines that the investments of plaintiff Consolo in commodity futures, were not investment contracts, and, perforce, not securities within the purview of the Securities Act of 1933 and the Securities Exchange Act of 1934. The Court lacks subject matter jurisdiction to entertain the causes of action brought thereunder, and, in accordance with Rule 12(b)(1), Fed.R.Civ.P., must dismiss the Complaint as it relates to the foregoing securities acts.

■ Finally, the Court is requested to assume jurisdiction over this action pursuant to the Commodity Exchange Act of 1936, 7 U.S.C. § 1 *et seq.* Nowhere in the Complaint does plaintiff allege the exhaustion of available administrative remedies. Upon review of the relevant statutory language and interpretive case authority, the Court is constrained to initially defer jurisdiction to the appropriate administrative agency, or, in the alternative to the arbitration panel in New York.

As originally promulgated, the Commodity Exchange Act made no provision for a private cause of action against alleged violators of its prohibitory sections. The Seventh and Eighth Circuit Courts of Appeals have determined, on the other hand, that in the absence of any statutory prohibition, private causes of action are cognizable under the Commodity Exchange Act. *Case & Company, Inc. v. Board of Trade,* 523 F.2d 355 (7th Cir. 1975); *Deaktor v. L. D. Schreiber & Co.,* 479 F.2d 529 (7th Cir.), *rev'd,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Booth v. Peavey Company Commodity Services,* 430 F.2d 132 (8th Cir. 1970).

However, in *Case & Company, Inc. v. Board of Trade, supra,* the Seventh Circuit acted in derogation of the Supreme Court's reversal of the Seventh Circuit decision in *Deaktor v. L. D. Schreiber & Co., supra.* In so reversing, the Supreme Court referred to its prior decision in *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), and adopted the holding therein, stating:

Because administrative adjudication of alleged violations of the CEA [Commodity Exchange Act] and the rules lay at the heart of the task assigned the Commission by Congress, we recognized that the court, although retaining final authority to interpret the CEA and its relationship to the antitrust laws, should avail itself of the abilities of the Commission to unravel the intricate and technical facts of the commodity industry and to arrive at some judgment as to whether the Exchange had conducted itself in compliance with the law. An adjudication by the Commission that the actions of the Exchange were authorized or required by the CEA would not necessarily dispose of the question of immunity from antitrust liability. We nevertheless thought the considered view of the Commission would be of sufficient aid to the court that the action should not go forward without making reasonable efforts to invoke the jurisdiction of the Commission. (citations omitted). 414 U.S. at 114–15, 94 S.Ct. at 467.

The foregoing pronouncement of the Supreme Court controls the course of litigation in the action now before this Court. In accordance therewith, plaintiff must first exhaust available administrative remedies before further pursuing this action in the federal courts.

■ Furthermore, the Court directs the attention of the parties to a recent amendment to the Commodity Exchange Act, § 13a–1 of Title 7, United States Code, enacted October 23, 1974. Therein, the Commodity Futures Trading Commission is specifically authorized to bring an action in the proper district court of the United States to enjoin any practice violative of the Act or enforce compliance with any provision of the Act or rule, regulation or order promulgated thereunder. In lieu of instituting such actions itself, the Commission may request the Attorney General to do so. No other party is granted authority to prosecute such an action. In light of this recent amendment to the Act, taken in conjunction with the Supreme Court decision in the *Deaktor* case, the Court concludes that

plaintiff is not possessed of a private cause of action in the present posture of this case and the Court, therefore, is not possessed of jurisdiction of the Complaint with respect to the Commodity Exchange Act of 1936.

As plaintiff's claims pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Commodity Exchange Act of 1936, suffer dismissal for lack of jurisdiction, so, too, must plaintiff's remaining claims premised upon the pendant or ancillary jurisdiction of the Court.

■ Moreover, the Court does recognize the right of the parties to agree to arbitrate disputes arising under the Customer's Agreement. The Commodity Exchange Act, unlike the Securities Act of 1933 and the Securities Exchange Act of 1934, does not preclude the arbitration of disputes arising thereunder, and the Court furthermore recognizes a strong policy favoring arbitration of controversies arising out of contracts evidencing transactions involving commerce. Arbitration Act of 1947, 9 U.S.C. § 2. Therefore, in accordance with the manifest intent of the parties, the Court must accede to the primary jurisdiction of the American Arbitration Association.

Accordingly, the Court having determined that it is without jurisdiction to entertain any cause of action brought in this Complaint pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act of 1936 and the principles of pendant jurisdiction, IT IS ORDERED that: the Motion to Stay Arbitration and the Motion to Stay the Action Pending Arbitration are hereby denied; the Motion for Protective Order is rendered moot; and the Complaint is hereby dismissed, with each party to bear its own costs of litigation.

IT IS SO ORDERED.