**DYKER BLDG. CO., Inc. et al. v. UNITED STATES, to Use of Parreco, et al.**

**UNITED STATES, to Use of Parreco, et al. v. DYKER BLDG. CO., Inc. et al.**

Nos. 10190, 10191.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 6, 1950.

Decided March 27, 1950.

Mr. Joseph T. Sherier, Washington, D. C., for Dyker Bldg. Co., Inc. and another.

Mr. James C. Robertson, Washington, D. C., also entered an appearance for Dyker Bldg. Co., Inc. and another.

Mr. Alexander M. Heron, Washington, D. C., with whom Mr. John J. Donnelly, Jr., Washington, D. C., was on the brief, for United States to the Use of Parreco.

Before PROCTOR, FAHY and BAZELON, Circuit Judges.

FAHY, Circuit Judge.

Complaint was filed in the United States District Court for the District of Columbia in the name of the United States to the Use of Theodore Parreco and others against the Dyker Building Company and the United States Fidelity and Guaranty Company. Recovery was sought of $30,308.04 alleged to be due under a subcontract on a housing project for which the Building Company was the principal contractor with the Unit-

ed States. The United States Fidelity and Guaranty Company was surety on the bond of the contractor to protect persons supplying labor and materials. The subcontract of the Parrecos was for labor and materials for excavations, fillings, gradings, stripping of top soil, furnishing of borrow fill, and kindred work. Their action was met by a counterclaim of the Building Company for $9,673.84, alleging overpayment of that amount.

On May 31, 1944 the District Court, on motion of the use plaintiffs consented to by the Building Company referred the action to a special master to take evidence and to report the same with his findings of fact and conclusions of law. Four years later, on June 1, 1948, he so reported to the court. On January 14, 1949, his findings of fact and conclusions of law were sustained over various objections of the parties. Judgment was accordingly given for the use plaintiffs in the sum of $13,765.96, with interest at the rate of six percentum per annum from October 8, 1943, as to the Building Company, and from April 22, 1944, as to the surety company. The judgment included costs, except that the costs of reference were ordered to be divided. Both sides appealed.

We discuss first the status of the findings of the special master. Rule 53(e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides: " * * * *In Non-Jury Actions.* In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. * . * * "

This is like the rule of the cases as laid down in Camden v. Stuart, 1891, 144 U.S. 104, 118, 12 S.Ct. 585, 590, 36 L.Ed. 363. The circumstances there were somewhat similar to those in the case at bar. The Court said: "In cases of this kind, referred to a master to state an account, depending, as they do, upon an examination of books, upon the oral testimony of witnesses, and perhaps, as in this case, upon the opinions of an expert, 'his conclusions have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part' ", citing Tilghman v.

Proctor, 1887, 125 U.S. 136, 8 S.Ct. 899, 31 L.Ed. 664, and other cases.

See, also, Crawford v. Neal, 1891, 144 U. S. 585, 596, 12 S.Ct. 759, 36 L.Ed. 552.

Rule 53(e) (2) is in terms designed to govern the conduct of the trial court. This is pointed out in Adams County v. Northern Pac. Ry. Co., 9 Cir., 1940, 115 F. 2d 768, 779, in the following context, "This rule, of course, regulates the conduct of the trial judge and not that of the appellate court." But Rule 52 provides in part, " * * * The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." The same Rule also provides "Findings of fact shall not be set aside unless clearly erroneous, * * * ". We therefore may not properly set aside a judgment which rests upon findings of fact made by a special master and adopted by the trial court unless at least such findings are clearly erroneous.

1. *The Amount Found Due the Use Plaintiffs for Stripping of Top Soil.*

The special master awarded $16,416 to the use plaintiffs for the removal or stripping of 27,360 cubic yards of top soil at the contract rate. There is no serious dispute as to the quantity actually stripped. The Building Company contends, however, first that the contract limited the quantity for which payment should be made to approximately the amount required for landscaping, because, it says, the contract limited to landscape work the uses to which the removed top soil was to be put. It contends further that only about 50% of the total graded area contained top soil and that this also constituted a limitation which brought the amount stripped well under the quantity found by the master. A figure of approximately 15,051 cubic yards is reached by the Building Company. It relies for support of its first contention upon Smoot v. United States, 1914, 237 U.S. 38, 35 S.Ct. 540, 59 L. Ed. 829; Maryland Dredging & Contracting Co. v. Coplay Cement Mfg. Co., D.C. 1920, 265 F. 842, 844; and Atwater & Co. v. Terminal Coal Corp., D.C.1940, 32 F. Supp. 178, 181. These cases are to the effect that where a contract states an approximate quantity to be supplied but it appears that actual need is the true measurement intended, recovery is to be based on the amount needed. This principle is not applicable to the present case. The specifications provide that top soil over areas to be occupied by any buildings, streets, and other named areas should be removed to an average depth of six inches and stacked on the site. The special master stated: "The specifications required that the existing top soil, in certain specified areas was to be stripped to a certain thickness. No quantity limitation is mentioned in the contract between the parties or in the contract plans and specifications. It required only that it must exist in the specified positions."

He answered the Building Company's contention for a limitation of the compensable quantity to the amount needed for re-use by pointing out that the provisions relied upon to support this position "apply only to use after stripping and do not limit the volume to be stripped," for which latter volume payment should be made. This was a proper interpretation of the contract; under it the cases relied upon by the appellants are not applicable.

As to the facts regarding quantity the amount computed by the engineer, 27,360 cubic yards removed and stacked,[1] is not clearly erroneous. No convincing evidence refutes this computation.

1. He sought to change this figure to 25,333 to take account of "correction for swell"—a correction which the special master disallowed because of its tenuous basis.

The use plaintiffs contend that since the entire graded area was 1,625,525 square feet, and the top soil was to be stripped to an average depth of six inches over this area, 30,102 would be the correct number of cubic yards of stripped top soil. They concede, however, that the actual amount fell somewhat short of this. There is some evidence which indicates that only between 50% and 60% of the 1,625,525 square feet contained top soil; but there is other evidence that 10,096 cubic yards of top soil were re-used as fill, that 5,193 cubic yards remained stacked, and that 12,071 cubic yards were used as fine grading.

We have noted the contention of the Building Company that verbal instructions were given to limit the stripping of top soil to 16,000 cubic yards. This was a sharply disputed factual issue. The special master during a rather full review of the conflicting evidence said, "If the defendant desired to make this modification to the contract * * * they were negligent in not making some definite arrangements which would have made the plaintiff responsible for stripping only 16,000 cubic yards of top soil."

Further, "defendant clearly intended that no change orders of any kind would be recognized by them", unless in . writing. The resolution of the special master of this disputed issue is well supported by evidence and we do not disturb it.

**2. The Questions Regarding the Amount of Borrow Fill for Which Use Plaintiffs Should be Paid.**

The special master found that a total of 12,175 cubic yards of borrow fill was required. He arrived at this figure by subtracting 26,552 cubic yards of general excavation spoil used as fill from a gross fill of 38,727 cubic yards. The amount of general excavation spoil is not disputed and it does not seem that the figure of 38,727 cubic yards for gross fill is disputed. It is accepted by the Building Company; it is the figure cited by the engineer in his testimony.[2] The use plaintiffs do not question its correctness. Rather they seek to avoid its effect by contending that borrow fill should be computed by reference to actual measurements at the borrow pits. The master rejected this contention, pointing to the contract provision that all quantities should be computed " * * * from data indicated on the contract drawings * * *" We agree with the master's rejection of this contention.

The Building Company's contention that borrow fill amounted to only 2,079 cubic yards is not acceptable. They compute as follows: from gross fill (38,727) they subtract general excavation spoil (26,552) and excess top soil reused as fill (10,096) to

reach their figure (2,079) for borrow fill. The error in this method is that it ignores the fact that quantities must be computed in accord with the contract drawings. The item of excess top soil reused as fill was not contemplated by those drawings and only enters the picture as a result of certain change orders discussed in part 1, *supra,* of this opinion.

What happened is this: 27,360 cubic yards of top soil were stripped. Of this total the parties agree that an item of 12,- 071 cubic yards of top soil was reused as top soil. Thus a void, contemplated in the contract drawings was created and filled. Both parties also agree that another item of 10,096 cubic yards of this top soil was reused as fill. Thus a void, not contemplated by the contract drawings but within the scope of the change orders, was created and filled. These operations cancelled themselves out and could have no effect on the gross fill required. The fact remains that gross fill must be computed on the basis of the contract drawings. The removal, and subsequent replacement, of these two items, could not change the proportional relationship between the original line and the finish line as shown in those drawings.

These two items subtracted from the 27,- 360 cubic yards of top soil leave 5,193 cubic yards for which to account. It is not disputed that this amount of excess top soil remained unused at the completion of work. It is obvious that the removal of this item created a void not contemplated by the contract drawings. Its removal was within the scope of the change orders. But, since it was not used as fill, or in any other way on the site, it follows that the additional void created by its removal must have been filled from an outside source, i. e., the borrow pits. It is this item of 5,193 cubic yards to which the master referred in making his finding of 38,727 cubic yards of gross fill required. He states:

"The Locraft finding (R. 356) of 38,727 cubic yards of gross fill is based upon quantities computed from the Contract Drawings *with adjustment for excess top soil.*

2. It is but 1.5 percent less than the figure independently given by another

engineer who computed from the contract drawings 39,252 cubic yards.

This procedure complies with the provisions in the contract between the parties.

\* \* \* \* \* \*

"\* \* \* The evidence (R. 356) shows that *this additional void, due to some of the top soil not being re-used as fill,* was included in the Locraft finding for gross fill required." (Emphasis supplied).

The record and transcript of testimony are replete with evidence that the engineer originally computed the gross fill required, as per contract drawings, to be approximately 33,520 cubic yards. To this he added the additional fill necessitated by the removal of 5,193 cubic yards. Thus he arrived at a total of 38,713 cubic yards of gross fill required. This figure is but 14 cubic yards less than the final figure (38,727) to which he testified at the hearing and which the master adopted. In view of the complex computations involved we regard this difference as *de minimis*. This method of computing gross fill is in accord with the contract and change orders. It was accepted by the master and we concur in his action.

With two pertinent figures thus established, or conceded, the finding as to amount of borrow fill required follows as a matter of arithmetic. Deduction of the 26,552 cubic yards of general excavation spoil from the 38,727 cubic yards of gross fill required (computed in accord with contract drawings) leaves 12,175 cubic yards of borrow fill. This was the amount found by the master and we find it supported by the evidence.

 3. *The Question as to the Division of the Costs of Reference.*

The appellants in No. 10191 (the use plaintiffs, appellees in No. 10190) object to the adoption by the trial court of the recommendation of the special master that the costs of reference, including the fee and stenographic costs of the special master, should be borne one-half by them rather than entirely by the Building Company and the surety company.

Rule 54(d) of the Federal Rules of Civil Procedure provides: "*Costs.* Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; \* \* \*"

In our opinion this rule applies to the present situation. We are cited to and can find no statute or rule to the contrary. Under the above provision costs should be allowed to the use plaintiffs as the prevailing party unless the court otherwise directs. Costs of reference properly may be considered as costs within the meaning of Rule 54(d). Expenses of this character were so considered in Ex parte Peterson, 1919, 253 U.S. 300, 318, 319, 40 S.Ct. 543, 549, 64 L.Ed. 919 cited by the use plaintiffs. There the costs of the auditor were required to be paid by the losing party, in accordance with what was stated to be the proper rule "except in those few cases where by express statutory provision or by established principles costs are denied". Rule 54(d), however, now permits the court to direct otherwise and to relieve the losing party of the full burden. The District Court has directed a division as recommended by the special master. We have no reason to hold that this was not a permissible exercise of discretion. The special master was appointed at the request of the use plaintiffs and with the consent of the Building Company. No doubt there were advantages to both sides in being allowed to develop the case at a more leisurely pace than a trial in court would have permitted. Furthermore, the amount sued for was substantially less than the award. Though they prevailed the use plaintiffs did not prevail entirely. This is not controlling but it is an element which with the others mentioned, enters into the propriety of the discretion which was exercised. See Blassengame v. Boyd, 4 Cir., 1910, 178 F. 1, 4.

 4. *The Contention That the Decision of the Engineer as to Quantities Was Final.*

We have approved the decision of the court below as to the top soil item (paragraph numbered 1, supra) based on the figures of the engineer. The present question accordingly is important only as to the item of borrow fill, considered above under paragraph numbered 2. The subcontract contains the provision, "all quantities shall

be computed by a disinterested qualified professional engineer as may be mutually designated by both parties hereto, from data indicated on the contract drawings as prepared by The Alley Dwelling Authority * * *." An engineer was designated by the plaintiffs. There is dispute as to whether he was accepted or mutually designated as contemplated; and we point out also that the subcontract does not provide that the computations of the engineer are to be final. The fact is that the so-called computation of the engineer as to the quantity of borrow fill, dated September 30, 1943, which the use plaintiffs rely upon, was not his own final computation. Our decision that this figure need not be accepted is based on the facts that the engineer himself changed his computation and made none as to borrow fill which could be said to be final and not subject to discussion and correction even from his own standpoint. As the special master properly stated, "the evidence discloses that Locraft [the engineer] has never made a final finding in accordance with the provisions of the contract and the defendants' conditional approval of the engineer." He also found, "the evidence shows that Locraft has revised his findings on subsequent occasions except contract items 6 and 8 [not here involved]. It is also shown that Locraft made many revisions after the September 30th findings, and that these revisions were the result of error on his part, and also changes in the methods of computing the quantities." Cases upholding the finality of decisions made so by agreement of the parties, See United States v. Moorman et al., 1949, 338 U.S. 457, 70 S.Ct. 288, are not applicable. Under the particular facts of the case at hand, which demonstrate that the claimed "final" computation was not deemed final even by the engineer himself, and that the engineer regarded himself and was regarded by the parties as no more than an informed expert, we agree with the court below in concurring with the views of the special master that "the evidence establishes that Locraft did not intend that the September 30th finding should be 'final', and it is found as a fact that they were not correct or final."

## 5. *The Allowance of Interest.*

The appellants in No. 10190 urge error on the part of the District Court in overruling their objection to the allowance by the special master of interest at the rate of six percentum per annum from October 8, 1943, as to the Building Company, and from April 22, 1944, as to the surety company. The October date is when the use plaintiffs submitted to the Building Company their "Final Invoice", claiming a balance due of $28,841.00. The April date is when the complaint was filed. The special master stated in his report, "That interest on said $13,765.96 shall run from the 8th day of October, 1943, at the rate of six (6) per centum per annum."

The trial court on objection of the appellants at first disallowed this item. Rehearing was sought by the use plaintiffs. The court then filed a memorandum stating that the special master had informed the court that he intended the item of interest as an element of damages in accordance with the provisions of 28 D.C.Code, § 2708 (1940). In the light of this additional information the court ruled that interest should accrue against the Building Company from October 8, 1943, and against the surety company from April 22, 1944. The controlling statutory provision reads as follows: *"Interest on judgments for damages in actions in contract or tort.* In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only; but nothing herein shall forbid the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest." 28 D.C.Code, § 2708 (1940).

The fair construction of the situation before us is that the trial court, on the basis of the views of the special master considered interest "necessary to fully compensate the plaintiff." We are unable to say that this determination is inadequately supported by the evidence. The general rule upon which the Building Company relies, that where the damages are unliquidated in-

terest runs only from the date of judgment, finds expression in the statute. The added provision to the effect that interest may be allowed in such cases as an element of damages overrides this general rule where "necessary to fully compensate the plaintiff." In the present case the supplying of labor is at the root of the recovery. So far as appears the use plaintiffs made the necessary outlays therefor. Furthermore, there is no intimation that the Building Company was not fully paid by the United States. We see neither an abuse of discretion by the trial court nor lack of compliance by it with the statutory standard governing the allowance of interest.[3] True it is that uncertainties as to the amounts due, and the long delay of the special master in making his report, are arguments against the award of interest for the full period which has elapsed. But the factors which support the award as necessary fully to compensate the use plaintiffs are sufficient to prevent opposing doubts from controlling our decision, especially in the light of the weight to be accorded the action taken in the District Court.

The judgment is

Affirmed.

3. In Fries, Beall & Sharp Co. v. Livingstone, 1926, 56 App.D.C. 269, 12 F.2d 150, 152, the court disallowed interest, saying, "The damages in this case being unliquidated, interest should not have been allowed until after the entry of judgment". But, as we have seen, the statute permits interest in such a case if necessary fully to compensate the plaintiff. The case must stand for no more than that in the circumstances there present this statutory criterion was not met.