GENERAL RAILWAY SIGNAL CO.,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Appellant.

GENERAL RAILWAY SIGNAL
CO., Appellant,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 29, 1986.

Decided May 12, 1989.

Thomas B. Dorrier, for appellant in No. 85–5753 and cross-appellee in No. 85–5768. Sara E. Lister, Robert L. Polk and Robert J. Sciaroni, Washington, D.C., were on the brief, for appellant in No. 85–5753 and cross-appellee in No. 85–5768.

Paul L. Waldron, with whom Michael L. Thomas, Alexandria, Va., was on the brief, for appellee in No. 85–5753 and cross-appellant in No. 85–5768.

Richard J. Webber, Washington, D.C., was on the brief, for amicus curiae, George Hyman Const. Co., in Nos. 85–5753 and 85–5768, urging that Washington Metropolitan Area Transit Authority has no immunity from payment of prejudgment interest on its contractual obligations.

* Senior Circuit Judge McGOWAN did not partic-

Before ROBINSON and STARR, Circuit Judges, and McGOWAN,* Senior Circuit Judge.

Opinion Per Curiam.

PER CURIAM:

This case involves a contract dispute between the General Railway Signal Company ("GRS" or "General Railway") and the Washington Metropolitan Area Transit Authority ("WMATA" or "the Authority"). The dispute concerns what amount should be deducted as an equitable adjustment for the elimination of part of certain work that General Railway contracted to perform on WMATA's subway system. Reviewing decisions by the General Manager of WMATA that responded to recommendations by the Army Corps of Engineers Board of Contract Appeals, the District Court entered judgment in favor of General Railway for $975,952 as principal and for $65,455.63 in interest. On appeals by both parties, we affirm the District Court's award of principal and interest as well as its decision as to the date from which such interest is to be calculated.

I

Although contractual relations between General Railway and WMATA date back over 16 years, the facts pertinent to the resolution of this controversy can be briefly stated.

In September 1971, the parties executed a lump-sum contract in the amount of $42,074,675.30. Of particular relevance to this case, GRS undertook to install wayside equipment for the automatic train control system and cables to connect that equipment to the train control room. The contract as originally executed called for GRS to excavate trenches alongside the train tracks for burial of the cable and to refill the trenches following installation.

In preparing to bid on the subway project, General Railway entered into a subcontract with L.K. Comstock to perform much of the work, including the "trenching" work just described. The original

ipate in this opinion.

subcontract between General Railway and Comstock provided for a lump-sum price of $34,491,410. Only after executing the subcontract did GRS seek, and Comstock provide, a breakdown of the lump-sum price into separate figures for various components of the work. The items into which Comstock allocated the lump sum accorded with line item figures WMATA required to be specified in the bids for the prime contract. GRS then incorporated these line item figures into the bid it subsequently submitted to WMATA. The prices for the three phases of the subway project listed in the unit price schedule of GRS' bid totalled $1,336,500 for the trenching work.[1]

Before the trenching work began, however, WMATA decided to have the cables installed in aboveground ductbanks rather than in underground trenches. WMATA's change of mind eliminated the need to have GRS, through its subcontractor, carry out this portion of its original contract. At the same time, it triggered the operation of the "Changes" clause of the prime contract. That clause provides in pertinent part as follows:

> If any change ... causes an increase or decrease in the Contractor's cost of ... the performance of any part of the work under this contract an equitable adjustment shall be made and the contract modified in writing accordingly.

WMATA–GRS Contract § 1.3(d), Record Excerpts ("R.E.") at 47.

The parties thereafter failed to agree on the amount properly credited to WMATA by virtue of the deleted work, thereby triggering the dispute resolution provision of the prime contract. See *id.* § 1.6, R.E. at 48–49. That clause designates WMATA's Board of Directors or its designated representative as the arbiter of contract disputes that cannot be resolved between the parties. *Id.* § 1.6(a). WMATA's Procurement Regulations, in turn, designate the General Manager of WMATA as the Board's representative for these purposes. WMATA Brief at 3. In addition, the Board by reso-

lution has authorized the Board of Contract Appeals of the Army Corps of Engineers to hear such disputes initially and propose resolutions to the General Manager. See *id.*

The dispute before the Board of Contract Appeals centered on whether the $1.3 million figure allocated to trenching work by GRS in its bid to WMATA (and subsequently included in the unit price schedule of the prime contract) accurately reflected the reasonable costs of performing that work (were it in fact to be performed). WMATA took the position that the three line-item totals for trenching work did approximate costs and therefore provided an appropriate basis for calculating an equitable adjustment. GRS, in contrast, argued that the line item figures for trenching were merely arbitrary allocations and that the actual costs of the deleted work were much lower. To support this assertion, General Railway pointed to estimates obtained by WMATA itself fixing the cost of trenching at about half the line item total.

The Board of Contract Appeals nonetheless decided that the line item figures supplied in GRS's bid (and thereafter in the contract's unit price schedule) were presumptively reasonable and that GRS "ha[d] not carried the burden of proving that the bid prices [were] not a reasonable price for the deduction." *General Railway Signal Co.*, ENG BCA No. 3970, at 14 (Dec. 30, 1983) [hereinafter *Initial Board Decision*], R.E. at 1, 14. In addition to this amount, the Board concluded, an additional five percent should be added to reflect GRS's reasonable profit on the deleted work. It therefore recommended that as an equitable adjustment WMATA be credited a total of $1,403,325 for the eliminated trenchwork. *Id.* at 15, R.E. at 15. The General Manager of WMATA approved and adopted this decision. Final Decision of General Manager, *General Railway Signal Co.*, WMATA Contract No. 1Z2011,

---

1. On September 29, 1971, Comstock's rights and duties under the subcontract were assigned to a joint venture consisting of Comstock and Fischback & Moore, Inc. *General Ry. Signal, Co.,* ENG BCA No. 3970, ¶ 5, at 2 (Dec. 30, 1983), Record Excerpts ("R.E.") at 2. For simplicity's sake we will use "Comstock" to refer to both the original subcontractor and its assignee.

ENG BCA No. 3970 (Apr. 7, 1984), R.E. at 20.

On review of the General Manager's decision, the District Court reversed. It rejected the Board of Contract Appeals' reliance on the bid price of $1.3 million. In the court's view, that figure was "simply an allocation required by WMATA for administrative purposes from successful bidders under lump-sum contracts." *General Railway Signal Co. v. WMATA*, 598 F.Supp. 595, 597 (D.D.C.1984) [hereinafter *Initial District Court Opinion*]. The contract price did not necessarily reflect the true costs of the deleted trenching work. Accordingly, the court granted GRS's motion for summary judgment and remanded to the Board of Contract Appeals to determine "a reasonable cost estimate" for the work. *Id.* at 598 (emphasis omitted). In addition, the court directed the Board to calculate interest on that amount "as provided by law." *Id.* at 597. WMATA's immediate appeal of the court's decision was dismissed as premature. *General Railway Signal Co. v. WMATA*, No. 84–5900 (D.C.Cir. order dated Mar. 27, 1985).

On remand, the Board of Contract Appeals examined in detail various estimates of cost advanced by the parties. WMATA clung to the contention that the line item price in the unit price schedule accurately reflected cost. The Board rejected this argument, however; it decided that the most accurate basis for calculating reasonable cost was an estimate from WMATA's own expert, Bechtel Corp. Bechtel had supplied WMATA with an estimate during the period immediately after elimination of the trenching work in the protracted period when WMATA and GRS were attempting to negotiate a settlement on their own. *General Railway Co.*, ENG BCA No. 3970, at 10 (Mar. 29, 1985) [hereinafter *Board Decision on Remand*], R.E. at 28, 36. The Board made an adjustment to Bechtel's estimate to take into account: (1) inclusion in the estimate of costs of trenching that were unnecessarily redundant; (2) inclusion in the estimate of costs attributable to a degree of soil compaction that exceeded what was appropriate or, presumably, contemplated by the parties; and (3) a mark up of 9.73%, proposed by both parties to reflect the contemplated profits of GRS and its subcontractor. *Id.* at 6, 10, R.E. at 33, 36. As a result of these calculations, the Board arrived at a credit due WMATA of $360,548. Under this determination, GRS was entitled to the amount of $975,952, which represented the difference between $1,336,500 (the amount withheld from GRS) and $360,548, the amount fixed by the Board as an equitable adjustment. See *General Railway Signal Co. v. WMATA*, 625 F.Supp. 22, 23 n. 2 (D.D.C.1985) [hereinafter *District Court Opinion After Remand*]. The Board declined to reach the issue of the interest properly awarded on this amount, however, because "WMATA's liability for interest in connection with equitable adjustments is now pending ... in several cases." *Board Decision on Remand* at 11, R.E. at 37.

The General Manager of WMATA refused to adopt the Board's recommendation. Instead, the General Manager reaffirmed her previous approval of the Board's first decision, which had adopted the line item figures for trenching as the proper equitable adjustment. *Final Decision of General Manager, General Railway Signal Co.*, WMATA Contract No. 1Z2011, ENG BCA No. 3970 (Apr. 5, 1985), R.E. at 39. GRS moved the District Court for judgment in its favor in accordance with the Board's recommendation.

The District Court upheld the decision of the Board as against the contrary view of the General Manager. *District Court Opinion After Remand*, 625 F.Supp. at 24. The former, it concluded, was "in accord with the Court's [previously articulated] view of the applicable law and was based on undisputable facts." *Id.* Furthermore, the trial court concluded, "WMATA ha[d] presented no substantial reasons for rejecting the Board's decision." *Id.*

In addition to $975,952 in principal, the court awarded interest to General Railway on this amount. WMATA had waived sovereign immunity from interest, the court

found, in its contract with GRS. *Id.* at 25.[2] The court further decided that the date from which prejudgment interest was properly calculated was April 17, 1984, the date on which WMATA's Board of Directors, through its General Manager, finally decided to withhold the full line item amounts for trenching. *Id.* at 24. The District Court fixed the rate of interest at six percent, relying on the statutory limit prescribed in D.C.Code Ann. § 28–3302(a) (Supp.1988) ("upon the loan ... of money ... in the absence of expressed contract.")[3] The court thus rejected General Railway's argument that WMATA had not only waived generally its immunity from awards of interest but had also waived the specific statutory limit in the Code. In the District Court's view, this argument "extend[ed] WMATA's waiver too far. The local provision clearly was intended to make six percent the applicable rate unless the parties fixed some other rate. No such rate was fixed here." 625 F.Supp. at 25. The District Court also awarded post-judgment interest to General Railway pursuant to D.C.Code Ann. § 28–3302(c) (Supp. 1988).[4]

## II

On appeal, WMATA argues that the District Court erroneously concluded that the line item figures for trenching did not reflect the reasonable cost of that work. WMATA also asserts that it should be immune from prejudgment interest. Finally, WMATA maintains that its liability for post-judgment interest is limited to four percent by virtue of D.C.Code Ann. § 28–3302(b) (Supp.1988).

■ General Railway, predictably, is satisfied with the District Court's award of principal. It contends that the court fell into error in its award of interest, however. First, it argues that prejudgment interest should have been calculated from the date on which WMATA's Contracting Officer issued his preliminary decision to withhold $1.3 million from GRS. Second, GRS maintains that the court erred in capping the rate of prejudgment interest at six percent. We consider in turn the awards of principal and interest.[5]

## A

■ The contract between General Railway and WMATA provides for "equitable adjustments" in instances where WMATA modifies the contract so as to increase or decrease the costs of work to be performed. The term "equitable adjustment" is a legal term of art; it signifies a princi-

2. The District Court specifically identified as the provision by which WMATA waived sovereign immunity "the 'equitable adjustment' language in the 'Changes' clause of the contract." 625 F.Supp. at 24. That clause was quoted in relevant part *supra* text at 322. The court reasoned that the legal concept of equitable adjustment is meant "to keep a contractor whole when the Government modifies a contract," and that "[p]rejudgment interest may be necessary to restore the contractor to the status quo prior to a change in the contract." *Id.*

3. The statute more fully provides as follows: The rate of interest in the District [of Columbia] upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6 percent per annum. D.C.Code Ann. § 28–3302(a) (Supp.1988). The contract between GRS and WMATA was executed and substantially performed in the District of Columbia; on this basis, its law was determined by the court to apply in this case. The parties have presented no reason why the law of another jurisdiction should be applied, nor do we discern any.

4. Section 28–3302(c) provides in relevant part as follows:
 The rate of interest on judgments and decrees, where the judgment or decree is not against the District of Columbia or where the rate of interest is not fixed by contract, shall be 70 percent of the rate of interest set by the Secretary of the Treasury pursuant to [26 U.S.C. § 6621 (1982)] for underpayments and overpayments of tax to the Internal Revenue Service....
 D.C.Code Ann. § 28–3302(c) (Supp.1988).

5. In reviewing disputes that arise under the "Disputes" clause of WMATA's subway contracts, this court has applied the contractually prescribed standard of review "which allows a court to reverse determinations of the General Manager when they are arbitrary, capricious, unsupported by substantial evidence, or incorrect as a matter of law." *George Hyman Constr. Co. v. WMATA*, 816 F.2d 753, 757 (D.C.Cir.1987). We shall do the same.

ple designed "to keep a contractor whole when the Government modifies a contract." *Bruce Construction Corp. v. United States*, 324 F.2d 516, 518, 163 Ct.Cl. 97 (1963). The proper measure of the adjustment is "the difference between what it would have cost to perform the work as originally required and what it cost to perform the work as changed." *Modern Foods, Inc.*, ASBCA 2090, 57–1 B.C.A. (CCH) ¶ 1229 (1975); see also *Bruce Construction*, 324 F.2d at 518–519. The primary dispute in this case has been and remains whether the $1.3 million line item figures contained in the unit price schedule of the prime contract establish the reasonable costs of the trenching work eliminated by WMATA. Like the District Court, we are convinced that they do not.

 As an initial matter, we do not accept WMATA's contention that these figures, quoted to General Railway by the subcontractor and then employed by GRS in its bid to WMATA, should be treated as sacrosanct. WMATA Brief at 33–37. To be sure, when parties have struck a bargain and included a specific price for work to be performed, that price is presumed to represent the reasonable costs of the work. See, e.g., *Nager Electric Co. v. United States*, 442 F.2d 936, 946, 194 Ct.Cl. 835 (1971); see also *Bruce Construction*, 324 F.2d at 518–519; *S.N. Nielsen Co. v. United States*, 141 Ct.Cl. 793, 797 (1958); *B–E–C–K–Christensen Raber–Kief & Associates*, ASBCA 16467, 73–1 B.C.A. (CCH) ¶ 9884 (1973). At the same time, courts have consistently rejected efforts to equate bid prices for various portions of work with contract prices. The reason is judicial recognition that contractors frequently submit unbalanced bids, understating the true costs of one portion of the contract with an offsetting overstatement on a different portion. For the reasons that follow, we agree with the District Court that, in this case, the $1.3 million line item totals were not contractually agreed upon prices at which the work in question was to be performed; those line item totals therefore do not presumptively reflect the reasonable costs of that work.

For one thing, the bid prices for the three phases of trenching were supplied by the subcontractor (Comstock) to General Railway only after the GRS–Comstock subcontract had been executed on a lump-sum basis. See *Initial Board Decision* ¶¶ 7–9, at 3, R.E. at 3; *id.* at 16 (Sheridan, ALJ, dissenting), R.E. at 16. General Railway requested the breakdown of line item totals not as a precondition to agreement with the subcontractor, but rather, after the agreement had been reached, for General Railway's use in the unit price schedule required by WMATA.[6] Even more importantly, the prime contract with WMATA was likewise a lump-sum contract. See *Board Decision on Remand* ¶¶ 8–9, at 2–3, R.E. at 30. Further evidence appears in the fact that progress payments under the prime contract bore no relationship to the unit price schedule of which the line items were a part. *Initial District Court Opinion*, 598 F.Supp. at 597. Finally, the line items were apparently based on a flat rate of $5 per linear foot that could not be supported in the hearings before the Board. *Id.* The want of support is explained in part by the fact that the $5 flat rate was based merely on an oral quotation supplied to Comstock by excavators opining, without even knowing the type of material to be excavated, that the appropriate price range for the work was $2 to $5 per foot. Comstock then used the uppermost boundary of this range in its own bid to GRS, assuming that it was a "safe figure." *Board Decision on Remand* ¶ 17, at 5, R.E. at 32. The rather casual way in which the price range was provided, and Comstock's apparently offhand use of the high end in providing GRS with a further breakdown of the lump-sum subcontract strongly suggest that the line item totals derived from the flat rate were not contractually

---

6. In fact, the lump-sum GRS–Comstock subcontract did not expressly include the bid prices for trenching. They were implicitly incorporated by virtue of a clause incorporating WMATA's Invitation For Bid, which included the unit price schedule on which line items were listed. See *Board Decision on Remand*, at 3, R.E. at 30.

agreed upon prices. Cf. *Nager*, 442 F.2d at 947–948.

 Even if the line items were deemed contract prices, GRS submitted ample evidence to defeat the presumption of reasonableness typically accorded contract prices. The line item figures are grossly disproportionate to all three of WMATA's own estimates of actual cost, which ranged from $566,000 to about $650,000. See *Initial District Court Opinion*, 598 F.Supp. at 597. Even assuming *arguendo* that the flat rate of $5 per foot reasonably reflected the direct costs of trenching, the $1.3 million total line item figures would still stand condemned as unreasonable because they included an enormous 161.5% markup to cover profits and indirect costs. *Board Decision on Remand* ¶ 21, at 5–6, R.E. at 32–33. This top-heavy add-on is wholly disproportionate to the relatively modest indirect costs and the 9.73% profit figure employed in an estimate furnished to WMATA of the costs of the work that included these elements. See *Board Decision on Remand* ¶¶ 22, 27, at 6–7, R.E. at 33–34. Thus, the District Court was justified in remanding the case to the Board for a determination of reasonable costs, since the Board's initial reliance on the line items was misplaced.

 For essentially the same reasons, we can discern no basis for setting aside the Board's determination on remand that $360,548 was an accurate approximation of the reasonable cost of the originally contemplated trenching work. This estimate was based on the Bechtel estimate that, as we mentioned above, WMATA itself obtained at the time the parties were attempting to negotiate a settlement. See *supra* text at 323. The Board's most significant adjustment to this estimate was to lower the amount of redundant trenching upon which the estimate was based. See *Board Decision on Remand* at 10, R.E. at 36. This reduction finds ample support in the record. The amount of redundant trenching assumed appropriate by the Board was the average of the amounts employed in the three WMATA estimates. See *id.* at 9–10, R.E. at 35–36. In deciding to utilize an average of the three estimates, the Board took into account the physical characteristics of the job site that would necessarily limit the extent of redundant trenching below that assumed in the Bechtel estimate. *Id.* at 9, R.E. at 35.

In opposing the Board's approach, WMATA primarily renews its argument that the line item figures reflect reasonable costs. At the same time, it offers no substantial reasons why the Board's estimate is unreasonable. See *Final Decision of General Manager*, R.E. at 39.

We therefore affirm the District Court's judgment insofar as it fixed the principal due GRS at $975,952. We next consider the court's award of interest.

### B

Our review of the District Court's award of prejudgment interest requires us initially to consider whether WMATA enjoys sovereign immunity from liability for interest. If it does not, we must then determine the date from which interest was properly calculated and the applicable rate.

### 1

 WMATA is an instrumentality of each of the signatories—Maryland, Virginia, and the District of Columbia—to the Compact that created the Authority. See D.C.Code Ann. § 1–2431 (1981). As such, "WMATA's sovereign immunity exists because the signatories have successfully conferred their respective sovereign immunities upon it." *Morris v. WMATA*, 781 F.2d 218, 219 (D.C.Cir.1986). It is well-settled that a sovereign is immune from liability for interest unless it has waived its immunity by statute or contract. See, e.g., *United States v. North Carolina*, 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890). The Supreme Court has only recently reaffirmed this general proposition. See *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986).

In creating WMATA, the signatories (with Congress' authorization, see *Morris*, 781 F.2d at 219) expressly provided that the Authority could be held liable to some

extent for damages arising out of contracts. Section 80 of the Compact provides in relevant part:

> The Authority shall be liable for its contracts and for its torts ... committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory ... but shall not be liable for any torts occurring in the performance of a governmental function....

D.C.Code Ann. § 1–2431 ¶ 80 (1981). Applying the law of the District of Columbia, we conclude that under the circumstances of this case WMATA has waived whatever immunity from prejudgment interest it otherwise enjoys.

We base our conclusion on the contract between WMATA and GRS. The "Changes" clause of that contract, as we have seen, authorizes "equitable adjustments" in cases like this. This term imports into the contract a doctrine mandating a make-whole remedy that will restore a contractor to the contractor's pre-change circumstances. Courts have long recognized that restoration of a party to the *status quo ante* typically requires compensation for prejudgment interest, since it is an actual element of the costs incurred by virtue of the other party's conduct. See *Maryland Port Administration v. C.J. Langenfelder & Son, Inc.*, 438 A.2d 1374 (Md.Ct.Spec.App.1982); see also *Bebchick v. Washington Metropolitan Area Transit Commission*, 645 F.2d 1086, 1093 (D.C.Cir. 1981).[7] Thus, in agreeing wholly to compensate GRS for any costs sustained as a result of modifications in the work it wanted performed, WMATA waived its immunity from prejudgment interest, which in this case constituted a significant portion of those costs. See *supra* note 7.

Two further considerations buttress our conclusion that WMATA does not enjoy sovereign immunity from liability for prejudgment interest. First, the District of Columbia itself, from whom WMATA's immunity in this case derives, has on at least one occasion been held liable for interest as an element of damages under section 15–108 of the D.C.Code.[8] In *District of Columbia v. Pierce Associates, Inc.*, 527 A.2d 306 (D.C.1987), the court ordered the District to pay interest for its delay in making payment pursuant to the terms of a settlement agreement between it and a contractor. In an analogous context, the District recently enacted a statute permitting awards of interest against it for failures timely to pay for goods and services. See D.C.Code Ann. § 1–1172 (Supp.1988). Second, in a case involving the same parties now before us, this court has upheld the decision of a trial court awarding interest against WMATA for unreasonable delay in making an equitable adjustment under a contract. See *General Railway Signal Co. v. WMATA*, 664 F.2d 296 (D.C.Cir. 1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), *aff'g* 527 F.Supp. 359, 361 (D.D.C.1979) (action for breach of contract arising under D.C.Code Ann. § 15–109).

Accordingly, we hold that the District Court correctly determined that WMATA has no sovereign immunity from an award of interest in this case.

### 2

The two issues remaining concern the rate at which prejudgment interest should be set and the date from which it should accrue. We now address each of these problems in turn.

---

7. That prejudgment interest may constitute a significant element of damages is evident on the facts of this case. Even assuming for a moment that the District Court correctly held that interest should run from April 17, 1984, the date of WMATA's administrative decision on the equitable adjustment, and be limited to six percent, GRS would be entitled to over $65,000. See Reply Brief of GRS at 52 (chart comparing amounts of interest due under various theories of parties).

8. Section 15–108 provides:

> In an action in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

D.C.Code Ann. § 15–108 (1981).

■ The District Court, in reliance on D.C.Code Ann. § 28–3302, limited the rate of prejudgment interest due GRS to six percent. That section specifies that "[t]he rate of interest in the District [of Columbia] upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6 percent per annum." D.C.Code Ann. § 28–3302(a) (Supp. 1988). GRS insists that the equitable adjustment provision in its contract with WMATA is an "expressed contract," and that the market rate of interest should apply in order to make GRS whole. This argument invokes D.C.Code Ann. § 15–109 (1981), which permits trial courts to award prejudgment interest as an element of damages for breach of contract when needed to provide full compensation.[9] WMATA, on the other hand, points out that the equitable adjustment clause in the contract did not specify any particular interest rate, and contends that on this account Section 28–3302's six percent restriction should apply.

Our decision on rate of interest is controlled by *District of Columbia v. Pierce Associates* wherein the District of Columbia Court of Appeals held that "just as the trial court cannot award interest at a rate greater than 6% under Section 15–108 [pertaining to liquidated claims], it also cannot under Section 15–109, unless an express contractual provision is to the contrary." *Id.* at 311. The court rejected the contention that Section 15–109 conferred on trial judges a discretionary power to award interest at a higher rate as an element of damages, even though doing so would produce an equitable result. *Id.* at 310. Insofar as a prejudgment rate is concerned, the court said, any recovery above the statutory six percent must be premised on contractual language clearly evidencing the parties' intent to adhere to a specific rate. *Id.* at 311. The fact that the contract called for an equitable adjustment, the court added, did not alter this result. *Id.*

Guided, as we must be, by the law of the District of Columbia, we affirm the District Court's determination that the applicable rate of prejudgment interest is six percent per annum.

■ The second inquiry we must make relates to the date from which interest at that rate is to accrue. The District Court selected April 17, 1984, the date on which WMATA's general manager adopted the final findings of the Army Corps of Engineers Board of Contract Appeals as to the deductions attributable to the elimination of the trenching work. GRS contends that January 17, 1979, the date on which monies due GRS were first withheld, is the proper date. In resolving this dispute, we look to the pertinent statutes and relevant judicial interpretations.

Section 15–108, which is applicable to liquidated debts, provides for "interest on the principal debt from the time when it was due and payable, at the rate fixed in the contract, if any, until paid." D.C.Code Ann. § 15–108 (1981). Clearly, though, WMATA's debt to GRS was not liquidated. On the other hand, Section 15–109, governing interest on unliquidated debts arising from contract breaches, proclaims a general rule that interest is to run "from date of judgment only." See also *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543 (D.C. 1981). There is, however, the statutory exception for interest awarded as an element of damages, and that, as authoritatively construed, charts the course to be pursued here. *District of Columbia v. Pierce* recognized that the court's "discretionary equitable power" under Section 15–109 "extend[s] . . . to the fixing of the effective *date*, not [the] *rate*, of such interest in contract cases in which the debt is unliquidated." *Id.* at 310 (footnote omitted) (emphasis in original).

Section 15–109 expressly refers only to "action[s] to recover for breach of contract," D.C.Code Ann, § 15–109 (1981), but

9. D.C.Code § 15–109 states:
 In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section

does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. D.C.Code Ann. § 15–109 (1981).

it has been applied to a suit for accounting which, "although not framed as a breach of contract action, was based on a contractual relationship between the parties." *House of Wines v. Sumter*, 510 A.2d 492, 499 (D.C.1986). We ourselves have considered Section 15–109 as stating the principle governing a contractor's suit precipitated by unreasonable delay by WMATA in making payment pursuant to the equitable adjustment provision of a contract. See *General Railway Signal Co. v. WMATA*, 664 F.2d at 296. "[T]he disputed contract," we said, "included an implied condition requiring WMATA to make equitable adjustments of claims under the contract within a reasonable time." *Id.*

In the present case, Section 15–109 is plainly applicable. The equitable adjustment provision imposed a contractual duty on WMATA which it allegedly breached in 1979 by withholding an excessive amount of progress payments. The District Court ruled that interest would run from April 17, 1984, the date on which WMATA's general manager finally decided to withhold the full line items for trenching.

To be sure, in *Granite–Groves v. WMATA*, 845 F.2d 330, 343 (D.C.Cir.1988), we declared that "a contractor who has been subject to unreasonable delay is entitled to recover interest for the full period until the claim is paid." But we have never departed from the fundamental principle that the factfinder is to be indulged broad latitude in determining the point from which extent interest is to be awarded as an element of damages. In *Dyker Bldg. Co. v. United States*, 182 F.2d 85 (D.C.Cir. 1950), alluding to "the weight to be accorded to the action taken in the District Court," *id.* at 91, we affirmed a decision to grant interest from the date the contractor's final invoice was submitted. In *Flanaghan v. Charles H. Tompkins Co.*, 182 F.2d 92, 93–94 (D.C.Cir.1950), we stated more fully:

> [T]here are many situations in which courts have allowed interest as an ele-

ment of damages despite the existence of a real controversy and despite the fact that the claim had not been reduced to a liquidated amount. But under the statutory provisions in this jurisdiction, vesting as it does a broad measure of discretion in the jury or trial court, we should not lightly disturb the finding of the trial judge in a case such as the present. Certainly we find no abuse of discretion.

In the case at bar, the District Court elaborated its reasons for its conclusion that April 17, 1984, was the point at which interest was to begin to accrue:

> GRS seeks interest from the date of the contracting officer's final decision to withhold $1,336,500, on January 17, 1979. However, because this was subject to administrative appeal, this did not become WMATA's final decision under Article II, the disputes clause of the contract, until WMATA's board of directors acted through its designated representative, the WMATA general manager. That decision was rendered on April 17, 1984. There is no indication that this decision was unreasonably delayed so as to entitle GRS to interest from an earlier date. *See General Railway Signal Co. v. WMATA*, 664 F.2d 296 (D.C.Cir.1980) (per curiam). The Court concludes that prejudgment interest on the $975,592 is due to GRS as of April 17, 1984.

*District Court Opinion After Remand*, 625 F.Supp. at 24. We find no abuse of discretion in this regard, and accordingly affirm the District Court.

We hold that the District Court correctly ruled that WMATA has no sovereign immunity from an award of prejudgment interest. We also sustain the court's decision both as to the rate of prejudgment interest awarded and the date from which it was to be calculated. Although WMATA includes, as one of the issues on appeal, the court's allowance of post-judgment interest, pursuant to D.C.Code Ann. § 15–109, see Brief for Appellee at 60,[10] it advances

---

**10.** WMATA argues, in a solitary clause of its lengthy brief, that D.C.Code Ann. § 28–3302(b) (Supp.1988) applies in this case and requires that post-judgment interest be limited to 4 per-

cent. That provision, however, governs only "judgments ... against the District of Columbia." *Id.* WMATA has advanced no reasons in support of treating WMATA, a creature of inter-

no substantial reason to justify an upset of that determination. We therefore affirm the award of post-judgment interest according to the formula set forth in D.C. Code Ann. § 28–3302(c) (Supp.1988), providing 70 percent of the rate fixed by the Secretary of Treasury for overpayments and underpayments of federal taxes. See 26 U.S.C. § 6621 (1982).

*Affirmed.*

state compact, designed to be an instrumentality of three jurisdictions, as the District of Columbia. See *Morris,* 781 F.2d at 218. In the absence of any such reasons, we reject this argument, which WMATA itself does not appear to entertain seriously.